PARRO, J.
 

 12At issue in this appeal is whether the Louisiana Department of Revenue (Department) may impose sales taxes on certain meals provided by the owner of drilling barges for the benefit of its customers as well as use taxes on materials and supplies that were used in the reconstruction of the living quarters on one of its barges. After concluding that no taxes were due, the Board of Tax Appeals (Board) vacated the tax assessment against the owner. On judicial review, the district court upheld the Board’s decision with respect to those transactions. The Department appealed the applicable portions of the district court judgment. For the reasons that follow, we reverse and render.
 

 Facts and Procedural History
 

 R & B Falcon Drilling USA, Inc. (R
 
 &
 
 B)
 
 [1]
 
 is in the commercial business of drilling oil and gas wells. R & B owns about 30 drilling barges, which it provides under contract to its customers in the oil and gas industry. Pursuant to these contracts, R & B’s various services include providing these barges with a crew, drilling equipment, sleeping quarters, and catering services. Generally, all services are performed by R & B personnel pursuant to a lump-sum daily rate contract.
 

 Following a sales and use tax audit for the period of January 1, 1999, through June 30, 2001, the Department issued an assessment totaling $119,846.50
 
 [2]
 
 against R & B based on a finding that the following amounts were owed in taxes:
 
 [3]
 
 $63,622.11 on meal sales (after a credit of $29,149.85 for taxes paid on the purchases of groceries for the meals), $33,764.82 on additional
 
 *1085
 
 purchases of tangible personal property used in the reconstruction of the living quarters on a barge, and $22,459.57 on purchases of fixed assets/drill pipes. R & B filed a petition with the Board for a redetermination of |sthe sales and use tax assessment.
 

 After considering LSA-R.S. 47:305.1(B) and
 
 Mallard Bay Drilling, Inc. v. John Neely Kennedy, Secretary, Department of Revenue and Taxation,
 
 03-1495 (La.App. 3rd Cir.3/31/04), 869 So.2d 954, the Board found that no taxes were owed and vacated the assessment.
 
 [4]
 
 The Department then filed a petition for judicial review of the Board’s decision with the district court. The district court upheld the Board’s decision that R
 
 &
 
 B did not owe taxes on the cafeteria services (meal sales) in question or on the materials and supplies used in R & B’s reconstruction of the living quarters on one of its barges. However, the district court reversed that portion of the Board’s decision which held that no taxes were owed on the materials and supplies purchased by R & B for drilling activities. From those portions of the district court judgment adverse to it, the Department appeals, contending that the district court erred in failing to find that the following were taxable under the state sales and use tax provisions: R & B’s sale of extra meals for the benefit of its customers’ personnel and the materials and supplies used in the reconstruction of the living quarters on one of its barges.
 

 Standard of Review
 

 With regard to the appropriate standard of review for those decisions issued by the Board, LSA-R.S. 47:1435 is instructive, as that statute provides that reviewing courts may reverse or modify decisions of the Board, with or without remanding the case, if those decisions are not in accordance with law.
 
 International Paper, Inc. v. Bridges,
 
 07-1151 (La.1/16/08), 972 So.2d 1121, 1127. Judicial review of a decision of the Board is rendered on the record as made up before the Board and is limited to facts on the record and questions of law.
 
 Id.; see
 
 LSA-R.S. 47:1434. The Board’s findings of fact |,tshould be accepted where there is substantial evidence in the record to support them and should not be set aside unless they are manifestly erroneous in view of the evidence on the entire record.
 
 International Paper, Inc.,
 
 972 So.2d at 1127-28. Furthermore, if the Board has correctly applied the law and adhered to correct procedural standards, its judgment should be affirmed.
 
 Id.
 
 at 1128.
 

 Extra Meals
 

 A tax is levied on the sale at retail of each item or article of tangible personal property. LSA-R.S. 47:302(A). “Sale” means any transfer of title or possession, or both, of tangible personal property, for a consideration, and includes the furnishing, preparing, or serving, for a consideration, of any tangible personal property, consumed on the premises of the person furnishing, preparing, or serving such tangible personal property. LSA-R.S. 47:301(12). The term “sale at retail” does not include an isolated or occasional sale of tangible personal property by a person not engaged in such business. Former LSA-R.S. 47:301(10)(c)(ii).
 
 [5]
 
 “Business” includes any activity engaged
 
 *1086
 
 in by any person or caused to be engaged in by him with the object of gain, benefit, or advantage, either direct or indirect. The term “business” shall not be construed to include occasional and isolated sales by a person who does not hold himself out as engaged in business. LSA-R.S. 47:301(1). Absent this exclusion, the terms “sale at retail” and “business” would have included such activity. Notably, neither former LSA-R.S. 47:301(10)(c)(ii) nor LSA-R.S. 47:301(1) excludes from the definitions of “sale at retail” and “business” the frequent, regular, and repeated sales by a person, whether or not he holds himself out as engaged in business.
 
 [6]
 

 Drilling barges and personnel to operate the drilling rig equipment were |sprovided by R & B under contract to its customers, who are in charge of the drilling operations. When R & B contracted a drilling barge to a customer, R & B charged a daily rate for the barge and the services provided by its drilling personnel. R & B also contracted with its customers for a certain number of meals provided to its drilling personnel per job or contract. In R & B’s standard contract, R & B further provided meals free of charge for two customer personnel per day. So, in addition to the number of meals for R
 
 &
 
 B’s drilling personnel provided for in the contract, if more than two customer personnel or customer third-party personnel came on board in a day, there would be a meal charge for these extra personnel.
 
 [7]
 
 The customer was charged a fee for each additional meal at a rate of $12 per meal or $48 per day for three meals and a snack. The charge was, in effect, a reimbursement of the additional costs incurred by R & B to provide the extra meals.
 
 [8]
 

 The evidence reveals that, during the tax period in question, R & B’s customers were charged the following for extra meals for more than two customer personnel or customer third-party personnel per barge per day:
 

 1999 2000 2001
 

 January $ 83,300.00 $ 57,462.50 $126,012.50
 

 February $104,700.00 $ 42,000.00 $ 52,512.50
 

 March $ 63,250.00 $ 61,725.00 $107,712.50
 

 April $ 67,487.50 $ 63,562.50 $165,087.00
 

 May $ 49,125.00 $ 71,175.00 $ 46,662.50
 

 June $ 51,525.00 $ 76,512.50
 

 July $ 31,550.00 $ 97,512.60
 

 August $ 53,037.50 $ 104,325.00
 

 September $ 56,650.00 $ 110,862.50
 

 October $ 66,487.50 $ 160,112.50
 

 leNovember $ 62,987.50 $ 118,800.00
 

 December $ 69,462,00 $ 107,700.00
 

 Total $769,562.00 1,071,750.00 $487,987.00
 

 Therefore, over the course of 29 months or 882 days,
 
 [9]
 
 R & B charged its customers a total of $2,319,299 (an average of $2,629.59 per day) for extra meals that were provided to customer personnel or customer third-party personnel. At a per day rate of $48, R & B would have provided extra meals on all of its barges for almost 55 people daily.
 

 
 *1087
 
 The schedule of advance tax credit due that was offered into evidence and that was prepared by the Department in connection with R & B’s purchases of food reveals that during the 29-month period in question, R & B’s total purchases of food was $5,128,254.81. The percentage of excess meals charged to customers to the total meals prepared ranged from 11.06 to 18.79 percent. The portion of R & B’s food purchases used only for preparation of excess meals was $822,464.61. At a rate of almost 55 persons per day for 882 days, the cost of the food used to prepare extra meals averaged approximately $16.95 per person a day, while extra meals were being sold for not more than a total of $48 per day, a difference of $81.05. Furthermore, the total of extra meals was sold for approximately $1,496,834
 
 [10]
 
 above the food costs.
 

 The evidence establishes that R & B’s sales of extra meals for the benefit of customer personnel and customer third-party personnel were not isolated and occasional in that they were made frequently, routinely, and continuously. We recognize that R & B’s primary business is not the sale of meals. It is undisputed that the availability of the living quarters was integral to R & B’s commercial operations of the drilling barges. We find that the same holds true for its service of providing extra meals for the benefit of its customers. Because R & B engaged in the sale of extra meals frequently, routinely, and ^continuously as a part of its regular business, R & B should be construed to be engaged in that “business” for purposes of LSA-R.S. 47:301(1) and 301(10).
 
 See McNamara v. Oilfield Const. Co., Inc.,
 
 417 So.2d 1311, 1318 (La.App. 3rd Cir.),
 
 writ denied,
 
 422 So.2d 157 (La.1982).
 
 [11]
 
 We find the facts of this case to be distinguishable from those of
 
 Marmac Corp. v. McNamara,
 
 546 So.2d 585 (La.App. 1st Cir.1989), involving the sale of non-serviceable barges by the lessor of a fleet of approximately 750 barges.
 
 [12]
 

 For these reasons, we find the record does not contain a reasonable basis to support the factual finding that the sales of extra meals were occasional or isolated sales of tangible personal property made by a person not engaged in such business and, therefore, this finding was an unreasonable one.
 
 See Stobart v. State, through the Dept. of Transp. and Dev.,
 
 617 So.2d 880, 882. Because the undisputed evidence demonstrates that during the subject tax period R & B continuously and repeatedly sold extra meals as part of its regular business, the district court’s affir-mance of the Board’s finding was manifestly erroneous. Accordingly, we conclude that R <& B’s sales of extra meals are taxable.
 

 
 *1088
 

 Materials and Supplies for Living Quarters
 

 At issue in this case is also an exemption from sales and use taxes provided by LSA-R.S. 47:305.1. At the time of R <& B’s purchase of the materials |sand supplies in question, LSA-R.S. 47:305.1 provided in its entirety:
 
 [13]
 

 A. The tax imposed by R.S. 47:302(A)(1), 321(A)(1), and 331(A)(1) shall not apply to sales of materials, equipment, and machinery which enter into and become component parts of ships, vessels, or barges, including commercial fishing vessels, drilling ships, or drilling barges, of fifty tons load displacement and over, built in Louisiana nor to the gross proceeds from the sale of such ships, vessels, or barges when sold by the builder thereof.
 

 B. The taxes imposed by R.S. 47:302 and R.S. 47:321 shall not apply to materials and supplies purchased by the owners or operators of ships or vessels operating exclusively in foreign or interstate coastwise commerce, where such materials and supplies are loaded upon the ship or vessel for use or consumption in the maintenance and operation thereof; nor to repair services performed upon ships or vessels operating exclusively in foreign or interstate coastwise commerce; nor to the materials and supplies used in such repairs where such materials and supplies enter into and become a component part of such ships or vessels; nor to laundry services performed for the owners or operators of such ships or vessels operating exclusively in foreign or interstate coastwise commerce, where the laundered articles are to be used in the course of the operation of such ships or vessels.
 

 C. The exemption from the state sales tax provided in this Section shall be applicable to any sales tax levied by a local governmental subdivision or school board.
 

 D. Repealed by Acts 1982, No. 56, § 4, eff. July 10,1982.
 

 The exemption provided for in Subsection B applied only to “ships or vessels” and was inapplicable to the drilling barge at issue in this case.
 
 See Mallard Bay Drilling, Inc. v. John Neely Kennedy, Secretary, Department of Revenue and Taxation,
 
 04-1089 (La.6/29/05), 914 So.2d 533, 548-49. Thus, the Board legally erred in utilizing LSA-R.S. 47:305.1(B) to determine the taxability of the materials and supplies used in the work performed on the barge’s living quarters.
 

 On the other hand, the exemption provided for in Subsection A only ] ^applied to materials used in the original construction of the barge, not to those used in replacing barge components.
 
 See McNamara v. Central Marine Serv., Inc.,
 
 507 So.2d 207, 208 (La.1987). After examining the legislative intent relative to the scope of the exemption granted by LSA-R.S. 47:305.1(A), the supreme court in
 
 McNamara v. Central Marine Serv., Inc.
 
 observed that the exemption was created to relieve Louisiana shipyards of a competitive disadvantage with shipyards in neighboring states.
 
 [14]
 

 Id.
 
 at 209-12.
 

 
 *1089
 
 The materials and supplies were used in the reconstruction of the barge’s living quarters, which became a permanent part of the barge. Since the materials and supplies were for the replacement of the living quarters, as opposed to the original construction, they do not qualify under
 
 McNamara v. Central Marine Serv., Inc.
 
 for the exemption set forth in Subsection A of LSA-R.S. 47:305.1. Furthermore, R & B is not a shipbuilding company and does not build ships in Louisiana.
 

 Because the materials and supplies were used for more than a mere repair, R & B urges that this case is distinguishable from
 
 McNamara v. Central Marine Serv., Inc.
 
 and these materials and supplies qualify for the exemption. Department regulations seem to support R & B’s argument that materials and supplies that become a component part during a major refurbishing of an older vessel or hull is exempt under LSA-R.S. 47:305.1(A).
 
 See
 
 LAC 61:I.4403(A). To qualify for exemption under LSA-R.S. 47:305.1(A), materials, machinery, and equipment that become component parts of ships, vessels, or barges of 50 tons load displacement and over, built in Louisiana, must be added during construction or reconstruction. LAC 61:I.4403(A). Materials, machinery, and equipment that replace worn components are not exempt under LSA-R.S. 47:305.1(A). LAC 61:I.4403(A). However, reconstructions qualify for exemption under LSA-R.S. 47:305.1(A) if they modify the craft’s function, such | i0as conversion of a deck barge to a crane barge, or restore the craft to seaworthiness following its destruction by sinking, collision, or fire. LAC 61:I.4403(B). Under Department regulations, reconstructions qualify for the exemption but only in limited situations, none of which are present in the instant case.
 
 [15]
 

 Had the legislature intended the exemption at issue to apply to the repairs, where such materials and supplies enter into and become a component part of such a barge, it could have done so by using the specific language it employed in other provisions of LSA-R.S. 47:305.1.
 
 See
 
 LSA-R.S. 47:305.1(B). Accordingly, we conclude that the Board legally erred in finding that R & B was entitled to a sales tax exemption on the materials and supplies which replaced original components of the living quarters on its barge.
 
 See Canal Barge Co., Inc. v. McNamara,
 
 511 So.2d 1196, 1198 (La.App. 4th Cir.1987).
 

 Decree
 

 For the foregoing reasons, we reverse those portions of the judgment of the district court which have been appealed, as well as the decision of the Board of Tax Appeals. Judgment is rendered reinstating the December 4, 2002 assessment by the Louisiana Department of Revenue against R & B Falcon Drilling USA, Inc. for the tax period of January 1, 1999, through June 30, 2001. All costs are assessed to R & B Falcon Drilling USA, Inc.
 

 REVERSED AND RENDERED.
 

 [1]
 

 . The Offshore Drilling Company is now the successor in name to R & B.
 

 [2]
 

 . With interest calculated to February 2, 2003, the assessment totaled $170,248.77.
 

 [3]
 

 .All of the transactions that were the subject of the audit occurred in Louisiana inland waters.
 

 [4]
 

 .
 
 Mallard. Bay Drilling, Inc.,
 
 869 So.2d 954, was subsequently reversed by the supreme court.
 
 See Mallard Bay Drilling, Inc. v. John Neely Kennedy, Secretary, Department of Revenue and Taxation,
 
 04-1089 (La.6/29/05), 914 So.2d 533, 548-49.
 

 [5]
 

 . After the effective date of 2003 La. Acts, No. 73, § 1, this provision is now found at LSA-R.S. 47:301 (10)(c)(ii)(bb).
 

 [6]
 

 .Any ambiguity in a taxing statute must be construed in favor of the taxpayer.
 
 United Gas Corporation v. Fontenot,
 
 241 La. 564, 129 So.2d 776, 781 (1961);
 
 McNamara v. U.O.P., Inc.,
 
 389 So.2d 741, 750 (La.App. 2nd Cir. 1980);
 
 Marmac Corp. v. McNamara,
 
 546 So.2d 585, 588 (La.App. 1st Cir.1989). However, tax exemptions are an exceptional privilege that must be expressly and clearly conferred in plain terms.
 
 Showboat Star P’ship v. Slaughter,
 
 00-1227 (La.4/3/01), 789 So.2d 554, 560;
 
 McNamara v. Central Marine Serv., Inc.,
 
 507 So.2d 207, 208 (La.1987).
 

 [7]
 

 . The meals prepared by R & B's staff are not for sale to the general public nor does R & B hold itself out to the public as being engaged in cafeteria-style service. This service is considered by R & B to be an adjunct of its primary business related to the drilling of oil and gas wells.
 

 [8]
 

 . Groceries were purchased to prepare all the meals, and R & B paid sales taxes on these purchases.
 

 [9]
 

 . 365 days in 1999 + 366 days in 2000 + 151 days in 2001 = 882 days.
 

 [10]
 

 . $2,319,299-$822,464.61 = $1,496,834.39.
 

 [11]
 

 . In
 
 McNamara v. Oilfield Const. Co., Inc.,
 
 the court stated that although the sales of signs, cattle guards, lumber, nails, and aluminum gates made up only a small part of the defendant’s total revenues (less than 1% of its gross revenue), those sales were a part of the defendant's regular business and therefore taxable.
 
 McNamara v. Oilfield Const. Co., Inc.,
 
 417 So.2d at 1318.
 

 [12]
 

 . Marmac Corporation (Marmac) was engaged in the leasing and servicing of a fleet of approximately 750 barges throughout the Gulf Coast and the Mississippi/Ohio River waterways. Marmac sold old barges for scrap or other use when they became no longer serviceable for Marmac’s leasing business.
 
 Marmac Corp. v. McNamara,
 
 546 So.2d at 586. In any given month, Marmac sold no more than one-fourth of one percent of its fleet — hardly the amount of sales volume which would be characteristic of the business of selling barges.
 
 Id.
 
 at 587-88. The court agreed that the sales of barges were merely incidental to the main business of Marmac as a lessor of barges.
 
 Id.
 
 at 588.
 

 [13]
 

 . The legislature amended Section 305.1 in 2002 (which is after the tax period in question) to define "foreign or interstate coastwise commerce.”
 
 See
 
 current LSA-R.S. 47:305.1(0; 2002 La. Acts, No. 40, § 1, effective June 25, 2002; 2002 La. Acts, No. 41, § 1, effective June 25, 2002. The supreme court has found that Subsection C is prospec-live only.
 
 Mallard Bay Drilling, Inc.,
 
 914 So.2d at 537. The legislature amended Section 305.1(B) in 2006 to include barges and drilling ships.
 
 See
 
 current LSA-R.S. 47:305.1(B); 2006 La. Acts, 1st Ex.Sess., No. 34, § 1.
 

 [14]
 

 . The court in
 
 McNamara v. Central Marine Services, Inc.
 
 noted that if the legislature had
 
 *1089
 
 intended to exempt repair parts, i1 could have done so as it had in LSA-R.S. 47:305.1(B), relating to ships and vessels operating exclusively in foreign or interstate coastwise commerce.
 

 [15]
 

 . In so observing, we render no opinion as to the legal effect of LAC 61:1.4403(B).